UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| UNITED STATES OF AMERICA | ) |  |
|---|---|---|
|  | ) |  |
| v. | ) | CAUSE NO. 2:02-CR-34(01) RLM |
|  | ) |  |
| MITCHELL BLAKE, | ) |  |
| a/k/a Martin Garnett | ) |  |

OPINION AND ORDER

This matter comes before the court on defendant Martin Garnett's motion to dismiss the indictment in this case based on the Sixth Amendment's Speedy Trial Clause. Mr. Garnett was serving a lengthy sentence when he was indicted in this court in 2002 for smuggling heroin into this district while imprisoned in Thailand. The United States made a request to Thailand to extradite Mr. Garnett under a treaty between the two nations, and Mr. Garnett finally was extradited in 2011, nine years after his indictment. For the reasons that follow, the court finds that Mr. Garnett was solely responsible for the delay and denies his motion to dismiss.

I. Background

In 1993, Martin Garnett (who is known to the government as Mitchell Blake, but referred to here as Martin Garnett based on his preference) began serving a sentence in Thailand for a violation of Thai law. The United States government alleges that, between 1999 and 2001, while Mr. Garnett was incarcerated in

Thailand, he was involved in the importation of controlled substances into Indiana. In 2002, a grand jury in the Northern District of Indiana indicted Mr. Garnett and two other defendants.

The United States and Thailand have a treaty in effect that includes, among other things, an agreement to extradite people accused of crimes. The making a request for extradition country (in this case the United States) is called the requesting country and must follow specified procedures and transmit specified documents to show that the requested extradition is grounded in fact and law. The requested country (in this case Thailand) may defer the extradition if that country is then proceeding against the defendant or if the defendant is serving a sentence for a different offense.

In 2002, the United States government filed a request that the Thai government extradite Mr. Garnett based on the indictment. In 2005, the Thai government formally informed the United States that the Thai court of appeals had affirmed the request. It indicated that Mr. Garnett was in custody and that Thailand anticipated that Mr. Garnett's sentence there would conclude in 2025 and it would extradite him then.

In 2005, while incarcerated in Thailand, Mr. Garnett wrote four letters to the court. In the first, he asks, "Do I have the right to a speedy trial? One would hardly call 15 years in the future speedy!" Doc. No. 4. He also asks, "Please let me know how to contact a legal representative or tell me how to directly enter a plea or a 'motion' asking for a speedy trial." In the second letter, written the same day

as the first but addressed to the Magistrate Judge, he inquires about his rights generally, adding, "Do I, for example, have the right to a speedy trial?" Doc. No. 5. In the third, Mr. Garnett inquired about his rights generally, noting that the United States Attorney's office hadn't responded to the earlier letters, but Mr. Garnett didn't directly invoke the Speedy Trial clause. Doc. No. 7. The fourth letter focused less on constitutional rights and instead was a request that the court lift the pending arrest warrant. Doc. No. 9.

In 2010, the government was informed that Mr. Garnett's Thailand sentence was ending, and in May 2011, he was extradited to the United States and arrested. A trial is scheduled to begin on November 8, 2011.

II. THE SIXTH AMENDMENT RIGHT TO A SPEEDY TRIAL

The Sixth Amendment to the Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. CONST. amend VI. Courts balance four factors when deciding whether this provision is being violated: (1) the length of the delay, (2) the reason for the delay, (3) whether and to what extend the defendant asserted his right, and (4) the prejudice to the defendant. Barker v. Wingo, 407 U.S. 514, 530 (1972). The court of appeals has clarified that the inquiry is "circumstance-specific," with no predetermined formula for how much weight to give each factor. Williams v. Bartow, 481 F.3d 492, 505 (7th Cir. 2007) (*citing* Barker v. Wingo, 407 U.S. at 530).

*A. The Length of the Delay*

The first factor, the length of the delay, "serves as a 'triggering mechanism;' without some presumptively prejudicial lapse of time, there is no need to examine the rest of the factors." Williams v. Bartow, 481 F.3d at 505 (*citing* Barker v. Wingo, 407 U.S. at 530). Nine years passed between the indictment of Mr. Garnett and the first opportunity for a trial. The government concedes that the first factor is met based on that span. The length of time and the government's concession indicate a delay that is presumptively prejudicial, triggering inquiry into the other factors.

*B. The Reason for the Delay*

Once the inquiry is triggered, the second factor – the reason for the delay – usually becomes dispositive. In United States v. Loud Hawk, 474 U.S. 302, 315 (1986), the Supreme Court called this factor "[t]he flag all litigants seek to capture." While the right to a speedy trial is constitutional, the defendant is considered to have waived the right when the delay is chargeable to him. Barker v. Wingo, 407 U.S. at 529. Whether the delay is chargeable to the government or the defendant is a fact-specific inquiry. The court of appeals has found that fleeing the country or using a false name to avoid arrest makes the delay chargeable to the defendant. United States v. Arceo, 535 F.3d 679, 685-686 (7th Cir. 2008). In contrast, the Supreme Court has found that when the defendant could have been located with a simple search that the government didn't conduct, the delay is

4

chargeable to the government. Doggett v. United States, 505 U.S. 647 (1992). The Court also noted that "different weights should be given to different reasons." United States v. Loud Hawk, 474 U.S. at 315 (*quoting* Barker v. Wingo, 407 U.S. at 531).

Mr. Garnett argues that the reason for the delay either should be assessed against the government or should be deemed to be the fault of neither party.

1.

To assess the delay against the government, the court would need to find that the government was deficient in its efforts to bring Mr. Garnett to trial. *See* Barker v. Wingo, 407 U.S. at 527 ("A defendant has no duty to bring himself to trial; the State has that duty."). Most analyses center on apprehending at-large fugitives, but a few cases deal with defendants who are incarcerated in other jurisdictions. In Smith v. Hooey, 393 U.S. 374, 383 (1969), when considering whether Texas had done enough to obtain a prison in federal custody, the Supreme Court explained that a state has a "constitutional duty to make a diligent, good-faith effort to bring" a defendant to trial when the defendant is being held by another jurisdiction. In United States v. McConahy, 505 F.2d 770, 773 (7th Cir. 1974), the court of appeals extended the Smith v. Hooey analysis to apply to the United States government when a defendant is being held by a foreign government. Unless the attempt to extradite would be futile, the government must make a good faith effort. United States v. McConahy, 505 F.2d at 773.

5

The government made its only extradition request in 2002. It appears that the request was properly made, for two reasons. First, by 2005 the Thai government notified the United States that the Thai court of appeals had affirmed the extradition. This seems to indicate that the extradition was examined and processed – at least administratively – and later affirmed. Second, the extradition actually proceeded in 2011 based on this single request. The treaty indicates that Thailand must extradite when the United States properly files the request and makes the required showings, but Thailand may delay the extradition to finish punishing someone it has proceeded against. That the treaty requires a request be properly made to be valid, that the Thai court affirmed the extradition, and that Mr. Garnett eventually was sent to the United States indicate that the United States requested extradition properly.

Mr. Garnett contends that the single extradition request, while apparently in compliance with the treaty, doesn't amount to an adequate level of diligence. The court disagrees. The Ninth Circuit Court of Appeals discussed a similar issue at length, noting that foreign relations and treaty negotiations are exclusively the province of the executive branch (with the advice and consent of the Senate). United States v. Hooker, 607 F.2d 286 (9th Cir. 1979). In that case, Peru would have had to release the defendant early from prison either in the hopes of having him returned at the end of his United States sentence or forgoing its right to punish him. Id. at 289. To engage in such a negotiation, though – for either the prisoner's eventual return to a Peruvian prison or for Peru to give up its sovereign

6

right to punish a wrongdoer – would be to tread on "the exclusive competence of the Executive Branch in the field of foreign affairs." Id. *(quoting* First National City Bank v. Banco National de Cuba, 406 U.S. 759, 761 (1972)). To force the United States to negotiate outside the terms of the extradition treaty also could bring serious diplomatic embarrassment. Id. at 290 (*quoting* United States v. Salzmann, 548 F.2d 395 (2d Cir. 1976)).

Mr. Garnett's insistence that the government should have done more is nearly identical to the argument rejected persuasively in United States v. Hooker. When an extradition treaty specifies the procedure, the court won't require the government to enter into separate negotiations with a foreign country. When the government made its single request to extradite Mr. Garnett, it did what was needed to secure Mr. Garnett; the treaty authorized no further efforts, so further efforts were unnecessary. The government can't be at fault for the delay.

2.

Alternatively, Mr. Garnett suggests that neither he nor the government is more at fault and that the reason for the delay should be deemed a tie between him and the government, so the inquiry should turn on the other three factors. He points out that because he was incarcerated by the Thai government before his alleged violation of U.S. law and because he remained in prison there during the alleged violations, at the point of the indictment, and for nine years after the indictment, he couldn't have taken – and, indeed, didn't take – any action to delay

7

the trial. He says the government can't cite a single instance of post-indictment action or inaction on his part that caused the delay in the trial.

This issue is novel; the parties tender no case law to guide the court. Speedy trial claims rarely are based on incarceration in another jurisdiction, rarer still when that jurisdiction is another country, and nearly unheard of when the charged crimes happened during the foreign incarceration. Resolution of this factor under such circumstances turns on two essential points.

First, dismissing the indictment for a speedy trial violation could put the government in the position that concerned the Ninth Circuit Court of Appeals in United States v. Hooker, 607 F.2d at 289. That is, the Attorney General of the United States would need to choose between pressuring the State Department to negotiate with the foreign government for an early release or waiving its right to prosecute a defendant. Id. Furthermore, if the State Department or the Attorney General began a practice of regularly negotiating for the accelerated extradition of people held by foreign governments for crimes committed there, any person incarcerated in a foreign country might be tempted to find a crime against the United States that he could commit from prison there to have the United States government obtain his release and extradition, particularly if the American prison system was thought to be more tolerable than that to which the person was sentenced. This illogical scenario would contravene the concept of fault for the delay, allowing foreign detainees to create United States constitutional concerns and then finding them not at fault for doing so.

Second, the court finds no support for the proposition that the delaying act must be committed after the crime was committed. Two cases instruct the court that, like Mr. Garnett's incarceration, the delaying factor may pre-exist the crime and the indictment. In <u>United States v. Corona-Verbera</u>, 509 F.3d 1105 (9th Cir. 2007), Mr. Corona-Verbera was a Mexican national when he was indicted in 1995 for building a drug-smuggling tunnel. Between 1980 and 1996, Mexico refused to extradite any Mexican nationals accused of drug crimes in the United States. In the late 1990s, extraditions slowly began to ramp up, and Mr. Corona-Verbera was arrested in Mexico at the request of the United States and extradited in 2003. It was Mr. Corona-Verbera's status as a Mexican national, which existed before the crime and before the indictment, that prevented his extradition for eight years. The court of appeals found that the government's diligence in pursuing Mr. Corona-Verbera was the sole criterion in assessing fault for the delay for speedy trial analysis purposes. <u>Id.</u> at 1115-1116.

A similar scenario existed in <u>United States v. Tchibassa</u>, 452 F.3d 918 (D.C. Cir. 2006). Mr. Tchibassa was indicted for his role in the kidnaping of an American citizen in Angola. Nearly eleven years passed between the issuance of an indictment and Mr. Tchibassa's arrest. The court found that the delay was attributable to the defendant living in a country that had no extradition treaty with the United States and in another country that, while it had an extradition treaty, refused to arrest him. Mr. Tchibassa had lived there before the crime, committed the crime in that region, and remained there for many years after.

9

What put him outside the reach of the United States pre-existed the crime and the indictment, but the court of appeals found that, because the government had pursued him diligently, the delay was attributable to Mr. Tchibassa. Id. at 925 ("[T]he record does not indicate U.S. authorities had any opportunity to readily apprehend Tchibassa. The delay in arresting Tchibassa was attributable primarily to his continued residence in an area over which the United States had no control and little influence.").

Neither of these cases addresses whether a defendant who did nothing post-indictment can be said to cause the delay; the Corona-Verbera and Tchibassa cases are instructive in demonstrating that the condition that delayed the trial needn't be created after the crime was committed or after the indictment was returned. Mr. Corona-Verbera avoided extradition by being a Mexican national in an era when Mexico wouldn't extradite Mexican nationals. Mr. Tchibassa avoided extradition by continuing to live in a region where countries either did not have extradition treaties or did not honor them on demand. Mr. Garnett's situation is similar. His pre-existing status as a Thai prisoner delayed his extradition for nine years. Furthermore, unlike Messrs. Corona-Verbera and Tchibassa's pre-existing status, Mr. Garnett's pre-existing status as a Thai prisoner was caused by a positive act of his (that is, violating Thai law). Whatever criminal act gave rise to the Thai prison sentence, it is more of an affirmative and willful action, to which fault can be attached, than simply being a citizen or resident of a country.

Either defendant in Cordoba-Verbera and Tchibassa could have left his home country and surrendered to the United States in spite of the fact that his country wasn't willing to extradite him. Mr. Garnett couldn't leave the Thai prison to go to the United States or anywhere. This distinction doesn't change the calculation for two reasons. First, a defendant does not have to bring himself to trial, the duty for doing so is the state's. Barker v. Wingo, 407 U.S. at 527. Therefore, with no duty to submit themselves to the United States, those defendants who didn't submit themselves to the United States are indistinguishable from Mr. Garnett, who was unable to do so. Second, Mr. Garnett's incarceration in Thailand was his own doing, and "[o]ne cannot defeat the law by his own contrivances." United States v. Solomon, 688 F.2d 1171, 1179 (7th Cir. 1973) (quotations omitted) (finding that when a defendant fled before he was indicted, he could not later claim the delay in the indictment was caused by the government). *See also* United States v. Arceo, 535 F.3d 679, 685-686 (7th Cir. 2008) (finding that when a defendant was arrested but not charged, then cooperated with the DEA as a confidential informant, then fled, and then was indicted, he was still at fault for the delay caused by fleeing and changing his name).

Mr. Garnett's being arrested and convicted in Thailand are completely attributable to Mr. Garnett. Those actions made him unavailable to the United States, so he must be charged with the delay for speedy trial purposes. That those

actions happened pre-indictment and even before the criminal activity make this case novel, but don't change the analysis. The delay is chargeable to Mr. Garnett.

*C. Assertion of the Right*

Mr. Garnett wrote to the court four times from the Thai prison. In two letters dated the same day, he asked to be tried on the pending charges. In another letter, he asked generally about his rights. In the fourth letter, he asked the court to release the arrest warrant.

A defendant has "some responsibility to assert a speedy trial claim," but the weight given this factor can vary according to the defendant's ability to assert the right and his unique circumstances." Barker v. Wingo, 407 U.S. at 529. The court of appeals has noted that when a defendant raises the speedy trial request nominally, but acts to delay the trial at the same time, his demand is "entitled to little, if any, weight." Williams v. Bartow, 481 F.3d 492, 506 (7th Cir. 2007) (*quoting* United States v. Taylor, 196 F.3d 845, 862 (7th Cir. 1999)).

Mr. Garnett's demands for a speedy trial were unequivocal. He tried to assert his right and he doesn't appear to have done anything from that point forward to delay the trial. The court acknowledges that the government sees Mr. Garnett's motive as an issue. According to the government's reading of the text of his letters, Mr. Garnett's motivation for a speedy trial may have been to get out of the Thai prison sooner or to beneficially change his status within the Thai prison to become eligible for transfer to Australia, rather than actually coming to the

12

United States court sooner. This distinction is irrelevant. Nothing in the case law says that the defendant can't have an ulterior motive in asserting his Sixth Amendment right to a speedy trial. As a matter of fact, the Barker Court acknowledged that lengthy pre-trial incarceration acted as prejudice against a defendant. Thus, when Mr. Garnett sought to reduce his incarceration in Thailand by invoking his right to be tried in the United States, he was exercising the right contemplated in Barker v. Wingo.

Mr. Garnett asserted his constitutional right to a speedy trial two or three times from inside a Thai prison, did so without the benefit of counsel, did so without being an American citizen or having any specialized knowledge of constitutional protections, and did so without acting in any way to delay the trial. Thus, Mr. Garnett properly asserted his speedy trial right.

*D. Prejudice*

When evaluating the prejudice factor in Barker v. Wingo, the Supreme Court identified three interests that merit protection: (1) preventing oppressive pretrial incarceration, (2) minimizing anxiety and concern of the accused, and (3) limiting the possibility that the passage of time will impair the defense. 407 U.S. at 532. "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Id. While the delay can compromise either side as witnesses become unavailable and memories fade, it can also be very difficult to prove prejudice because the harm

13

caused often isn't expressed in the record. Doggett v. United States, 505 U.S. 647, 655-656 (1992). Thus, the court of appeals has said that prejudice can be presumed when the circumstances would make it difficult to show specifics. United States v. Oriedo, 498 F.3d 593, 600 (7th Cir. 2007). In Smith v. Hooey, 393 U.S. at 378, the Supreme Court found that the first interest in the fourth Barker factor, preventing undue and oppressive incarceration prior to trial, could apply to someone who was already incarcerated. When a defendant is incarcerated in one jurisdiction and indicted in another, the delay in the second jurisdiction's trial might worsen the current incarceration.

> The inmate who has a detainer against him is filled with anxiety and apprehension and frequently does not respond to a training program. He often must be kept in close custody, which bars him from treatment such as trustyships, moderations of custody and opportunity for transfer to farms and work camps. In many jurisdictions he is not eligible for parole; there is little hope for his release after an optimum period of training and treatment, when he is ready for return to society with an excellent possibility that he will not offend again. Instead, he often becomes embittered with continued institutionalization and the objective of the correctional system is defeated.

Carchman v. Nash, 473 U.S. 716, 720 (1985) (quotations omitted) (explaining the justification behind part of the Interstate Agreement on Detainers, which is a compact between states providing for transfer of incarcerated defendants to other states so that they may be tried on pending charges there).

Mr. Garnett alleges that his ability to put on a defense might be compromised by the lapse of time. His two co-defendants both entered into plea agreements in 2007. One was to serve seventy months of imprisonment and the

other was to serve one month of imprisonment. Both were to be remanded to the Immigration and Naturalization Service for deportation proceedings upon their release. The government concedes that it has been trying to contact them in preparation for the trial against Mr. Garnett, but has been unsuccessful thus far. Furthermore, Mr. Garnett indicates that when word of his indictment reached Thailand via the extradition request, his conditions in the Thai prison greatly worsened. He was declared ineligible to be transferred to his home country of Australia under a prisoner exchange treaty. He says that after the indictment, he was shackled to the wall in the Thai prison.

Although Mr. Garnett isn't specific in how the delay has prejudiced his ability to mount a defense, nine years and two deported co-defendants could, in some cases, be very prejudicial. Furthermore, the worsening of conditions in the Thai prison meets the concern that the Barker Court called oppressive pre-trial detention and that the Hooey Court expounded on as a loss of rights and amenities in the prison of one jurisdiction because of the pending charges in another. Thus, Mr. Garnett has shown prejudice.

*E. Balancing the Factors*

The four-factor balancing test is circumstantial, to be applied by courts "on an ad hoc basis." Barker v. Wingo, 407 U.S. at 530 ("We can do little more than identify some of the factors which courts should assess in determining whether a particular defendant has been deprived of his right."). Yet, the Court made clear

15

in United States v. Loud Hawk that, despite a significant period of time, actual prejudice, and frequent speedy trial requests, if the cause of the delay is chargeable to the defendant, he cannot invoke the constitutional right. 474 U.S. at 315-317.

In this case, the length of time – nine years – is agreed to be presumptively prejudicial. Mr. Garnett asserted his constitutional right to an appropriate level, and he took no action that would lead the court to believe that the assertion was only perfunctory. Mr. Garnett hasn't presented evidence showing actual prejudice, but he has alleged that he was subjected to harsher conditions in Thailand because of the indictment, and the government agrees that it thus far cannot locate the co-defendants. Although it isn't clear whether the co-defendants' absence works in favor of Mr. Garnett or the government, enough time has passed and enough has been alleged that it is reasonable for the court to say that the delay has prejudiced Mr. Garnett.

The second factor – the reason for the delay – resolves this case. *See* United States v. Loud Hawk, 474 U.S. at 315. When Mr. Garnett violated Thai law, he caused his subsequent lengthy Thai prison sentence and incarceration. While the government had to act with diligence in securing him for trial, it had no duty to pursue futile steps. United States v. McConahy, 505 F.2d at 773. The government filed what the circumstances indicate is a proper extradition request and the Thai government agreed to the extradition — once Mr. Garnett finished his long Thai sentence. The treaty requirements are clear, and the government met them. To

require the government to do more would be futile. The totality of the circumstances indicate that the delay is chargeable to Mr. Garnett, and that he cannot claim a speedy trial right where he caused the delay.

III. CONCLUSION

For all these reasons, the court DENIES the defendant's motion to dismiss (doc. # 94).

SO ORDERED.

ENTERED:   September 23, 2011  

                                        /s/ Robert L. Miller, Jr.
                                       Judge
                                       United States District Court